HERMAN H. HEINEMAN v. EMIL HART.

*Partnership mortgage to secure individual debt.*

1. An insolvent's assignee can attack his assignor's transfers for fraud; and so can a receiver acting in place of an assignee. How. Stat. § 8741.

2. A chattel mortgage given without consideration to secure the antecedent individual debt of one of the partners is fraudulent as against creditors of the firm if, at the time it was given, the firm was insolvent or would become so by such a shrinkage in outstanding accounts as might reasonably be expected.

Appeal from Marquette. (Grant, J.) June 10–11.—Oct. 15.

BILL to avoid chattel mortgage, etc.   Defendant appeals.
Affirmed.

*W. P. Healy* for complainant.   Insolvency is the state of
one who is unable to pay his debts as they fall due in the
usual course of business: Bouvier tit. "Insolvency; *Lee
v. Kilburn* 3 Gray 600; *Bebb v. Preston* 3 Ia. 325; *Savery
v. Spalding* 8 Ia. 239; partnership assets constitute a trust
fund for the payment of partnership creditors: *Hutchinson
v. Dubois* 45 Mich. 147; *Murrill v. Neill* 8 How. 414; *Fer-
son v. Monroe* 21 N. H. 462; *Pierce v. Jackson* 6 Mass.
243; *Douglas v. Winslow* 20 Me. 89; *Conroy v. Woods*
13 Cal. 626; Pars. Part. 345; 1 Pars. Cont. (5th ed.) 204;
and one who knows that he is taking a mortgage on such a
fund is not a bona fide purchaser: *Judge v. Vogel* 38 Mich.
570; the courts call it a gift where a partnership pays or
assumes the debt of an individual partner: *Wilson v. Robert-
son* 21 N. Y. 587; *Keith v. Fink* 47 Ill. 276; *Menagh v. Whit-
well* 52 N. Y. 153; *Conroy v. Woods* 13 Cal. 626; *Burpee
v. Dunn* 22 Cal. 195; *Lill v. Egan* 89 Ill. 609; *Ferson v.
Monroe* 21 N. H. 462; *Collins v. Hood* 4 McL. 186; *Good-
bar v. Cary* 16 Fed. Rep. 316; *Elliot v. Stevens* 38 N. H.
312; *New Orleans v. Gauthreaux* 32 La. Ann. 1126; *Ed-
wards v. Hughes* 20 Mich. 289; *Sirrine v. Briggs* 31 Mich.
444; where there is a trust there must be a way to enforce
it, and a lien arises enforceable in equity by creditors: *Olson
v. Morrison* 29 Mich. 397; *Phelps v. McNeely* 66 Mo. 554;
but see *Coover's Appeal* 29 Penn. St. 9; equity will not sus-
tain an agreement made by partners for the purpose of
giving the separate creditors of one partner a preference to
the creditors of the firm, if the firm be at the time of mak-
ing the agreement insolvent; *Topliff v. Vail* Har. Ch. 340;
*Norwalk Nat. Bank v. Sawyer* 38 Ohio St. 339; *Burtis v.
Tisdall* 4 Barb. 588; *Ransom v. Van Deventer* 41 Barb.
307; *In re Cook* 3 Biss. 122: *Grasswitt v. Connally* 27
Gratt. 19.

*Ball & Hanscom* for defendant.   Partners, by agreement
among themselves, convert that which was partnership prop-
erty into the separate property of an individual partner, or
vice versa: 2 Lindley on Part. 654–5; if all the members
of a firm agree to the appropriation of firm property in pay-
ment of an individual debt, due from one of the members,

the creditors would take the property discharged of any claim or equity of the partnership creditors, because the members of the firm have expressly parted with their lien : *Hapgood v. Cornwell* 48 Ill. 64; *Reeves v. Ayers*, 38 Ill. 418 ; *Schmidlapp v. Currie* 55 Miss. 597; *Freeman v. Stewart* 41 Miss. 138 ; *National Bank v. Sprague* 20 N. J. Eq. 13 ; *Whitton v. Smith* Freem. Ch. 231 ; *Rice v. Barnard* 20 Vt. 479 ; *Allen v. Center Valley Co.* 21 Ct. 130 ; *Carter v. Beaman* 6 Jones L. 44; *Sigler v. Knox Co. Bank* 8 Ohio St. 511 ; *Campbell v. Mullett* 2 Swanst. Ch. 553 ; *City of Maquoketa v. Willey* 35 Iowa 323 ; *Schaeffer v. Fithian* 17 Ind. 463 ; *Shackelford v. Shackelford* 32 Gratt. 481 ; *Howe v. Lawrence* 9 Cush. 555 ; *Kimball v. Thompson* 13 Metc. 283 ; *Waterman v. Hunt* 2 R. I. 298 ; *Stokes v. Stevens* 40 Cal. 391; *Ladd v. Griswold* 4 Gilm. (Ill.) 25 ; *Clement v. Foster* 3 Ired. Eq. 213 ; Jones on Ch. Mort. § 44 ; Story's Eq. Juris. § 675 ; outside of an assignment for the benefit of creditors, there is nothing to prohibit one creditor from obtaining security for his debt, whatever may be the effect as to other creditors : *Olmstead v. Mattison* 45 Mich. 617 ; *Andrews v. Fillmore* 46 Mich. 315 ; a voluntary assignee cannot question the validity of his assignor's mortgage : *Wakeman v. Barrows* 41 Mich. 363 ; *Millar v. Babcock* 25 Mich. 137 ; *Voorhies v. Frisbie* 25 Mich. 476 ; but see *Coots v. Radford* 47 Mich 37.

CAMPBELL, J. This suit in equity was brought by complainant as receiver under an insolvent assignment made January 29, 1883, by the firm of Leopold & Co. (consisting of Asa F. Leopold and Albert Austrian), to Robert Hart, who resigned the office of assignee. Its object is to set aside a chattel mortgage purporting to have been made on the 19th of the same month by Leopold & Co. to defendant, as fraudulent against creditors. The court below gave a decree in favor of complainant, setting aside the mortgage. From this decree defendant appealed.

It was claimed on the argument that the assignee could not attack the conveyances or other transfers of his assignors for fraud, and that the receiver stands in the same disability. However this may have been under the old system of voluntary assignments, our present statutes (How. Stat. ch. 303) have intervened to regulate the whole subject, and by sec-

tion 3 [§ 8741] it is declared that the assignee may recover any property or equity which could be reached by creditors. This removes any difficulty, and authorizes such a suit as this.

Upon the case as presented by the record there is not much involved except a conflict of testimony. Upon the material questions the two partners are the chief witnesses, and contradict each other upon many facts. Upon others, which are quite important, they do not differ. The witness Leopold made out a plain case which, if true, would leave no doubt of the fraudulent character of the chattel mortgage in a legal point of view. Austrian's testimony does not give the same account of the later transactions. The circuit judge, who heard the testimony and saw the witnesses, was persuaded of the wrongful character of the dealings. We should feel disposed, in a conflict of testimony, to hesitate before disregarding his conclusions. Upon a careful examination of the record we feel satisfied with his determination. It will not be necessary to discuss the facts at length, beyond indicating in a general way the character of the controversy.

The firm of Leopold & Co. was formed in the spring of 1882, and was at first composed of Leopold and one Runkle, who were equal partners, and each put in $5000. Leopold borrowed his funds of his father, Aaron F. Leopold. In July, 1882, Runkle sold his share to Albert Austrian for $5339.78. No inventory was made, but it seems to have been thought a good bargain for Austrian. The latter borrowed of Emil Hart, the defendant, $6000 a part of which he paid Runkle to make up the entire price left after applying some other funds, of about $1900 already turned over, and the balance it is claimed he put into the firm. This loan of $6000 was in two notes—one on demand, and one indorsed by Austrian's brother, which matured a week or two before the mortgage in controversy.

On the 19th day of January, 1883, Leopold & Co. gave their firm chattel mortgage to defendant for this entire sum of $6000, with interest at ten per cent., payable the next May. This mortgage was recorded on the 23d of January. Some questions arose concerning the date of delivery, but in

the view we take they are of minor importance. At the same time they executed a mortgage to Aaron F. Leopold for the $5000 which his son borrowed of him. Aaron Leopold does not appear to have asked or desired this, and has not claimed it, but has given it up.

A few days after these mortgages were given, Albert Austrian went to Chicago for the express purpose of trying to get extensions from creditors there, in which he did not succeed. He thereupon returned and the assignment was at once made. There is a conflict of testimony as to how far this assignment had been contemplated previously, in case no extension should be granted, and also as to the supposed pecuniary condition of the firm. Austrian claims they were neither insolvent nor supposed to be, and that all of their difficulty grew out of failures to collect claims which were not supposed to be in peril when he went to Chicago. Leopold contradicts this very fully.

There was an inventory taken by Robert Hart, afterwards the assignee, in January, 1883, which at the full prices at which he then valued the assets, made them amount to $44,-844.39. This included debts due the firm of $17,890, which consisted chiefly of a large number of small accounts. The cash on hand was $2136.93, and the goods in stock were put at $19,407.06. The remaining assets, $5408.02, consisted of store, warehouse and barn, horses, store fixtures and the contents of the barn. The liabilities were summed up at $32,-844.39. This left an apparent balance of $12,003.32. The partners, as between themselves and the firm, seem to have stood on nearly the same footing, so as to be about equally interested, Leopold having about $520 more than Austrian. After the assignment the same Robert Hart made an inventory in which he reduced the value of the same articles largely, appraising the goods at a reduction of about $3400, and the accounts, of nearly $8000. The whole amount of assigned assets which came into his hands was by his estimate about $23,000.

It will be seen from this that at the highest valuation, and making no discounts from the accounts, the firm, in

January, 1883, was worth just about $12,000, which would give each of them $6000 if their accounts were even, but which left Austrian, by the books, worth a few hundred dollars less. Any shrinkage in values would of course reduce this balance of assets over liabilities.

Under these circumstances, on the 19th of January, 1883, if that is the true date, these partners gave to defendant a firm liability and chattel mortgage for $6000 to secure an individual debt of Austrian. Assuming as true the contradicted statement that it had been all along understood that the firm would be willing to do this, it is quite clear that up to this time it had not been done, and equally clear that there was no consideration moving to the firm to support it. It covered all and more than all of Austrian's interest in the firm, at the largest estimate made without shrinkage. At the same time a $5000 mortgage was made to Aaron Leopold for the debt due him by the other partner. The effect of this was to reduce the firm property to within a small amount of the nominal excess of assets over debts, and to put the available assets in the store out of reach of creditors, if the mortgages were to stand.

It was under these circumstances that Austrian went to Chicago to get an extension, and says that he had no idea of insolvency, although making the assignment a few days subsequently.

In our judgment his story is not probable, and if it were it would not remove some very serious facts. No man in his senses could imagine that there could be no risk of shrinkage in so large a body of scattered accounts, and no one could safely trust to meeting over $30,000 of debts out of a mortgaged stock and the real estate, horses and barn stock in the inventory. The direct effect of these mortgages was to withdraw nearly $12,000 from the partnership funds to which creditors had a right to look, for the personal benefit of the partners. That all this was done, and the stock tied up by mortgages under which it could be at once taken into the possession of the mortgagees, with no suspicion of insolvency, and no purpose of depriving creditors of their security, does

not seem to us credible. The facts in their best aspect were such as to put it in the power of the mortgagees to wind up and destroy the business at any time. If we consider what most business men would have thought of the available character and value of such assets thus incumbered, the result. would be unmistakable insolvency.

We have not thought it necessary to enlarge upon the details of testimony. The leading facts are so significant that. they seem inconsistent with any theory that would support. the transaction complained of.

We think the decree should be affirmed.

COOLEY, C. J. concurred.

CHAMPLIN, J. There are but two questions of fact in this: case, namely : 1. Was the mortgage to Emil Hart given to secure the individual debt of one of the members of the firm of Leopold & Co. at a time when the firm was insolvent? 2. Was the mortgage given to secure to Emil Hart a preference over the other creditors of Leopold & Co., contrary to the statute forbidding preferences in common-law assignments?'

The facts to be determined under the first question are,. was the mortgage given for the individual debt of Albert Austrian? and if so, was the firm solvent at the time? In looking at the testimony I am strongly impressed that there must be some mistake about Albert's borrowing from defendant two sums of three thousand dollars each. Albert testifies that he borrowed $6000 from defendant for the express purpose of purchasing Runkle's interest in the firm of Leopold & Runkle, which was agreed upon at $5339.78. He says also that he had about $2000 of his own means which he used in the purchase, and gave his notes to Runkle; one for $1000 payable July 15, and one for $2339.78 payable September 1, 1882. Now it will be seen that he needed only to borrow $3000 to pay Runkle aside from his own means, and that was the sum he asked for and obtained from defendant for that purpose. This amount was not obtained from defendant until September, at which time the amount going

to Runkle matured, and Runkle swears it was paid according to agreement. Why then should Albert Austrian borrow from defendant in October another $3000 to pay Runkle?

Both defendant and Albert swear that at the time he gave the note on demand in September, Albert agreed that defendant should have security therefor whenever he desired. If the note given in October, instead of being for a new loan, was made with the brother of Albert as indorser and delivered as security for the first note, I can then understand why in all the subsequent transactions down to January 12 the request was always made for security by the firm of this indorsed note both by defendant and the indorser, but never a request by defendant that the unsecured note should be secured. Moreover defendant, when asked where the first note was, replied that it might be among his papers somewhere; he did not know exactly where.

Austrian claims that he used the $6000 in paying Runkle, and that the balance he put into the firm; but an examination of his private account and his stock account fails to disclose any such fact. He swears the books show the amounts he put into the firm. The books do not show that he put in three thousand dollars in money over the amount paid for Runkle's interest. It rests therefore upon his own assertion, unsupported by other testimony.

He is equally at fault with his explanation of his stock account and the manner in which he paid Runkle. He is credited under date of July 11, 1882, with $813.98 " by Geo. Runkle's stock." He is asked what this credit represents. He replies: "It was George Runkle's stock account, and taking his private account; that is what I paid George Runkle for; that is a part of the $5300." And he further says that the balance of Runkle's interest was estimated at $4500 and represented his profits in the business and merchandise, "and on the inventory entered January 6th brings in where I paid him $4500." His counsel then asks: "It is a little less than $4500, is it?" *Answer.* "Yes; that is where I made a mistake by not taking the stock." The fact is that this item under date of January 6th is not a cash item

at all, and has no relation to the money paid to Runkle, but is entered as an item of profit, $4462.70, and the same amount is credited to Leopold under the same date.

I have no doubt however but that three thousand dollars of the six is a bona fide indebtedness, and that it was assumed by the firm as early as January 12, 1883, when the entry was made upon the books of the indebtedness of six thousand dollars; and conceding this and also that five thousand dollars of the individual debt of Leopold was at the same time assumed by the firm, the inquiry remains as to the solvency of the firm on the 19th of January, 1883.

In examining this question I shall take the definition of insolvency laid down by Lindley on Partnership to the effect that an insolvent firm is one in which the joint assets are less than the joint liabilities, and in consequence thereof it is unable to pay. Volume 2, p. 736, note. But in considering the liabilities, the amount of the assumed debts must be included; for if these with the other liabilities absorb all the assets and render the firm practically insolvent, it is plain to see that such act would be a fraud upon the creditors of the firm. We must look not only at the act itself, but at the effect of the act upon the rights of the creditors of the firm, and if its necessary results are to wreck the partnership, it is plain to be seen that it injuriously affects the firm creditors. To illustrate: Suppose a firm has assets valued at ten thousand dollars, and liabilities of eight thousand dollars. According to the test laid down by Lindley on Partnership the firm would be solvent. Would they have the right to assume an individual debt of one of the partners for five thousand dollars, and by this act render the firm insolvent? Could not the firm creditors contest the right of the creditor of the individual partner to share in the firm assets?

In this case Austrian testifies to the assets and liabilities on the 9th of January, 1883, and states them as follows:

ASSETS.

| | | | |
|---|---|---|---|
| Cash on hand | . . . | $ 2,136 | 93 |
| Accounts | . . . | 17,890 | 38 |
| Merchandise | . . . | 19,409 | 06 |

| Store fixtures | . | . | . | . | . | $ 723 | 02 |
| New store | . | . | . | . | . | 3,150 | 89 |
| Barn acc. | . | . | . | . | . | 964 | 00 |
| Barn building | . | . | . | . | | 205 | 33 |
| Warehouse | . | . | . | . | . | 364 | 78 |

| Total assets | . | . | . | $44,844 | 39 |

LIABILITIES.

| Bills payable . | . | . | . | . | . | $29,791 | 07 |
| A. F. Leopold | . | . | . | . | . | 3,050 | 00 |

$32,841 07

Add to this the indebtedness assumed
January 12, '83, viz.:

| Emil Hart | . | . | . | . | . | $ 6,000 | 00 |
| A. F. Leopold . | . | . | . | . | | 5,000 | 00 |

| Total liabilities | . | . | $43,841 | 07 |

This statement shows that by assuming the individual debts of the partners the entire resources of the firm were exhausted into about one thousand dollars.

The result reached above agrees also with the testimony of the receiver, who prepared and put in evidence a statement of resources and liabilities as shown by the books of the firm on the 29th day of January, 1883, by which it appears that the assets and liabilities on that day exactly equaled each other, amounting in the aggregate to $39,724.91.

But all parties interested in having the firm assume these debts knew at the time that the assets of the firm were not worth their inventoried value. A large amount of the assets consisted of debts due from men laboring in the mines. When the mining companies paid promptly, they paid promptly; but several of the companies were in arrear for three months, and the effect on the business of the firm had been of the most depressing nature. They found they should be unable to meet their engagements. They were unable to collect the indebtedness due them from the miners, even by resorting, as Austrian swears, to attaching the trunks and even the bibles of some of these debtors.

When the assignment was made on the 29th of January,

1883, an inventory of the assets was annexed, verified by the oath of Austrian, showing the original cost and the value at the time of making the assignment, in which he places the aggregate value of the assets, at original cost, at $34,740.13, and the real value at $22,970.55. It would be absurd to claim that this depreciation all occurred in ten days preceding the assignment. More than half of the assets consisted of outstanding accounts, of the face value of $17,973.88, and which he states to be of the real value of $10,000. The men's furnishing goods, boots and shoes, and dry goods he states were worth twenty-five per cent. less, and clothing fifty per cent. less than the original cost.

Can it be said, in view of these facts, that the parties acted in good faith and believed themselves solvent when they assumed individual indebtedness of $11,000, when the real value of the firm assets was $22,970.55 and their liabilities $32,841.07? They must be held bound to know the true financial condition of the firm, and while they profess to deceive themselves by inventories at cost prices, they cannot be permitted to deceive the public or creditors by any display of fictitious values. It is claimed by Austrian that they made during the short time they were in business a gross profit of $17,028.05, and a net profit of $8925.40, and that their inventory showed such to be the fact. Accordingly, we find entered to the credit of each partner, January 6, 1883, $4462.70. Austrian's testimony shows that no such profits were made. He purchased Runkle's interest July 1st, which included his share of the profits to that time, for $5339.78, which represents one-half of the net assets at that time. The whole, therefore, would be $10,679.56.

| | |
|---|---:|
| The total assets January 9th, as per inventory, were . . . . | $44,844 39 |
| Total liabilities . . . . | 32,841 07 |
| | |
| Net assets, January 9, 1883 . | $12,003 32 |
| Deduct net assets, July 6, 1882 . | 10,679 56 |
| | |
| Leaves net gain . . . | $ 1,323 76 |

This is what the inventory shows, instead of $8925.40.

The equity arising in favor of partnership creditors to have the partnership property first applied in satisfaction of their debts, is to be wrought out through the partners. They have no direct lien on the partnership assets which equity can enforce, except such as is based upon the rights of either partner to compel their application to the payment of the firm debts. The firm may, by mutual assent of the partners, assume the individual debt of one partner, and when this is done it becomes a debt against the firm, and the creditor acquires all the equities of a partnership creditor, if the transaction is bona fide, and not done for the purpose of defrauding other creditors of the firm. To effect this substitution in favor of the creditor, however, the debt against the individual partner must be discharged, and the firm substituted in his place as debtor. The transfer must be based upon a good consideration. If it be by way of security only it will not admit such creditor to an equal footing with the other creditors of the firm, because there has been no substitution from a creditor of the individual to the creditor of the firm.

Aside, then, from the consideration of the bona fides of the assumption of this debt by the firm, arises the question whether the debt was absolutely assumed, or whether it was only as a security for the debt of the one partner to the defendant. The testimony shows beyond all question that it was assumed only by way of security.

Defendant testifies that it was the understanding, when he loaned the money to Austrian, that at any time he wanted security from the firm he could have it, and that afterwards, when the note matured, Austrian told him he would see that the firm would give him another note or secure it in some way. And he says that the indorser was also urging his brother to give defendant other security in place of his indorsement. After the firm note was given, the defendant still retained in his possession the individual notes of Albert Austrian, and so far as appears, he is still the holder of them. This being so, I think the firm creditors have an equity superior

to defendant's in the application of the assets to the payment of their debts.

I am also of the opinion that the chattel mortgage given to the defendant should be held void as giving to defendant a preference contrary to the statute. It was made so near in point of time, it was so evidently a part of the purpose contemplated by partners and by defendant, that it must be considered as part of one and the same transaction.

Defendant testifies that he knew what the inventory of January, 1883, showed ; he knew of the depression in trade; he must have known, as a business man, that the large amount of the assets standing in open accounts against laborers in the mines was subject to great depreciation. He must have regarded them no better than such accounts of merchants generally. He was himself a merchant. His great anxiety to obtain security as early as January of a note already secured by indorsement, in which he was seconded by the indorser, who was a brother of one of the firm, and himself closely related, shows conclusively his distrust of their financial soundness and ability to continue business.

The fact that one of the firm swears that at the time they gave the security they contemplated an assignment, and the other that they were compelled to assign unless they obtained an extension, which is readily seen could not be obtained if the creditors knew of the mortgages, all conduce to prove that the mortgage and the assignment were part of the same scheme, and that by taking such mortgage defendant knew, or must under the evidence be held to have known that the very act of taking his chattel mortgage would force his creditors to make the assignment and secure to him a preference over other creditors of the firm.

Had the mortgage been taken by the defendant as security for a firm debt, without knowledge or notice of the insolvency of the partners and of their intent to make an assignment, it would have been valid in his hands. But a person cannot be permitted to evade the provisions of the law forbidding preferences by taking security from his debtor who is insolvent, while he is cognizant of his debtor's financial con-

dition and of his contemplated assignment, although a few days may intervene before its consummation.

I am forced to the conclusion, from all the evidence before us, that the defendant occupies the latter position, and that the decree appealed from should be

Affirmed with costs.

COOLEY, C. J. concurred.

SHERWOOD, J. The complainant in this case seeks by his bill to set aside, as fraudulent and against the statute, a certain chattel mortgage made by Asa F. Leopold and Albert Austrian, a company whose firm name was Leopold & Co., to the defendant, upon a stock of dry goods, notions, provisions, crockery and glassware, given on the 19th day of January, 1883, to secure the payment of $6000 on the first day of May following. The mortgage was duly filed on the 23d day of January, 1883. Emil Hart was the brother-in-law of Albert Austrian at the time of giving this mortgage. The firm also made another mortgage at the same time to Aaron F. Leopold, father of Asa, for the sum of $5000. This mortgage was also payable on the first day of May following, and both mortgages were given upon the partnership property.

On the 29th day of January, 1883, Leopold & Co. made a general assignment of all their property, for the benefit of their creditors to Robert Hart, brother of the defendant, under the statute of 1879. Hart went into possession of the goods and property transferred under the assignment and thereafter resigned his trust on the 20th day of February, 1883. Complainant was appointed receiver, and on the 16th of April following took possession of the assigned property and has since continued to discharge that trust, and as such receiver brings this suit.

The complainant avers in his bill.

1st. That the mortgage to Emil Hart was not given to secure a debt of the firm, but the private debt of Austrian to Hart, and that the partnership received no consideration therefor.

2d. That the firm was insolvent when the mortgage was

made; that they knew such to be the fact, and made the assignment in contemplation of such insolvency.

3d. That the giving of the mortgage and making the assignment was virtually one transaction, and in violation of the statute prohibiting preferences.

4th. That it appropriates the funds of an insolvent partnership to the payment of individual debts.

Complainant claims that for these four reasons said mortgage is invalid.

The defendant in his answer denies the facts stated in each of these four averments, and in regard to the first says the firm assumed the payment of the $6000 to him before the mortgage was made; that it was so done by an agreement with the members of the firm and himself.

In regard to the second averment he says the assignment was not contemplated, nor did the firm know that they were insolvent at the time the mortgage was made, nor were they in fact insolvent.

As to the third averment the defendant says that the giving of the mortgage and the making of the assignment were not one transaction; that when the firm made the mortgage they had no thought of making the assignment.

And as to the fourth averment he says that the mortgage was not given to secure the payment of the individual debt of Austrian, or that defendant ever admitted such to be the fact, but that on the contrary it was the debt of the firm.

Thus it will be seen that the material facts charged being all denied by the defendant, the complainant must rely upon the preponderance of his evidence to maintain the decree which was in his favor at the circuit.

The proofs show that in March, 1882, Asa F. Leopold and George F. Runkle were engaged as copartners in the business of general merchandising at Crystal Falls in the county of Marquette. They were to share equally the loss and profits in the business. Leopold put into the business $5000 which he borrowed of his father, Aaron F. Leopold.

In July following Runkle sold out his interest in the copartnership and its business to Albert Austrian, who was

received by Leopold as partner upon the same terms as Runkle, and their business was continued under the firm name of Leopold & Co. Austrian paid Runkle for his interest $5339.78, which was less than it was worth. Runkle left Leopold and their business because he was dissatisfied with Leopold.

When Austrian purchased he paid Runkle $1500 in money and $450 in iron company stock, and gave his notes for the balance, to pay which he hired $6000 of the defendant and used the remainder, about $2000, in the business of the firm.

There was no inventory taken of the stock, which was new when he purchased. The firm was and had been doing a prosperous business. Austrian examined the stock and the accounts and books showing the situation of the business, and bought upon such inspection and the information he had obtained.

When the $6000 was obtained from the defendant it was with the understanding with the defendant that it was for the purchase of the Runkle interest and to be used in the business, and that he could have the firm responsibility for its payment if not paid when due.

The firm took an inventory which was completed about the 7th or 8th of January, 1883, showing the assets to be $44,844.39 and the liabilities $32,841.07, with cash on hand to the amount of $2136.93. The inventory showed a gross profit of $17,028.05 and a net profit of $8925.40. This showing was made from ten months' business.

It further appears from the testimony that a half interest in the stock and business was at that time worth $7000, and could have been sold for that sum. Indeed it appears that the defendant, after having made a careful examination of the stock, stood ready to pay that amount for it.

On the 9th day of January Austrian's note to Hart became due, and Austrian not having the means to meet it the indebtedness was assumed by the firm, as was also the debt Leopold owed his father for means with which he started in business, and the proper entries of these amounts as indebtedness of the firm were made accordingly. On the 19th day

of January thereafter a firm note was given to the defendant for the $6000 thus assumed, and two chattel mortgages were given by the firm to secure the amounts going severally to the defendant and Leopold's father. On account of the death of the township clerk the filing of the mortgages was delayed until the 23d of January, when they appear to have been filed.

The record also shows that subsequently and on the 21st day of January the firm gave a chattel mortgage to the Manitou Iron Mining Company for $700.

During the interim between the time of taking the inventory and the time of making and filing the defendant's chattel mortgage several of the largest debtors to the firm stopped payment, and collections came in slowly; in consequence of which, and in anticipation of further delays Austrian went to Chicago to obtain an extension of time on their indebtedness, but could succeed with only a part of the creditors and returned, having failed to accomplish the object of his visit. On his return he met his partner Leopold on the road, and after canvassing the prospect of making collections and having doubts about their ability to meet their indebtedness promptly, decided to make an assignment and accordingly did so on the 29th day of January following.

It further appears that at the time these mortgages were made the partners believed themselves to be solvent, as did the defendant; that they were so in fact; that they did not make these mortgages to cheat or defraud any of their creditors, or in contemplation of insolvency; that the firm actually received the money for which the mortgages were given; and that they were given in good faith to secure the payment of such indebtedness. It is true there is testimony in the case given by the partner Leopold contradicting several of the important facts testified to by Austrian and necessary to sustain the foregoing conclusions; but there is a recklessness and want of candor both in the manner and statements of Leopold upon the stand, which very much depreciate the weight to be given to his testimony; and the other testimony

I think, by a clear preponderance, confirms the statements made by Austrian.

Besides the partners, the defendant Runkle, the assignee Hart and the plaintiff were sworn. None of the witnesses depreciate the value of the stock more than is usual in such cases, and some of them not so much. It is safe to say that in a majority of cases when the assigned goods are new, the depreciation is fifty per cent. and over; and I think it is apparent from the evidence that the value of a large portion of the assets depended upon the prosperity of the mining business; and the sudden panic in the iron trade in the month of January, 1883, and after the mortgage was given, greatly reduced the value of the assets.

I have been unable in the examination of this case to discover any fraud, actual or legal, on the part of Leopold & Co., or on the part of the defendant, which should be held to invalidate the defendant's mortgage. The surrender by Aaron F. Leopold of his personal securities to the receiver is a fact immaterial to the issue and has no bearing one way or the other. He was not sworn and does not tell us why he surrendered them; but the fact appears I think that his son Asa is inimical towards Austrian and the defendant, and seems quite willing that complainant should be successful in defeating the defendant's mortgage. The fact that Aaron's claim was mostly secured by mortgage upon real estate may throw some light upon the subject; and in this connection it will be observed by inspection of the record that no reason is given why the validity of the Manitou Iron Company's mortgage was not attacked, but so far as appears it was paid by the receiver without question though made several days after defendant's mortgages.

I do not think the complainant has shown by a preponderance of the evidence that the mortgage in question was given to secure Austrian's private debt; the money was all used by Austrian in the purchase of goods or in the business of the firm and for its benefit. Neither was it executed in contemplation of insolvency, but it was believed at that time that they had sufficient assets to collect to pay their debts.

The firm, at the time the mortgage was made, had assets considerably in excess of its indebtedness, including the mortgage of defendant and cash on hand, and it does not appear that they were pressed for payment when they did not pay. Up to the time of making the assignment they paid $1800 indebtedness after making the mortgage and before the time the assignment was made. No material change is shown in the financial condition of the firm after the January inventory was made, which was conceded by both parties to be correct, and shows them solvent. I do not think, under such circumstances, they could be regarded as insolvent. An insolvent firm is one in which the joint assets are less than the joint liabilities, and in consequence thereof, it is unable to pay. 2 Lindl. Partn. 736, note b. Neither of these things had occurred when the defendant's mortgage was made.

This relieves the case of any legal fraud, and no actual fraud is charged in the bill. This view substantially disposes of the case. A partnership, unless otherwise provided by statute, is liable to third persons, whether creditors or otherwise, in the same manner and to the same extent as individuals; and while the firm is solvent the creditors have no more a lien upon the debtor's goods in the case of a partnership than in the case of an individual; and while the firm is solvent it may assume the payment of any debt it chooses, as between it and the creditors, and I see nothing in the statute referred to by counsel changing the common law upon this subject.

It is the right of each partner to have the partnership funds, when necessary, applied to the payment of the partnership debts; but this is a question between them, and with which the creditors of a solvent firm have nothing to do. Under the statute, it is only when a lien is created equally in favor of all the creditors by the firm's insolvency that a creditor is prohibited from securing his claim in full, and it is only when a mortgage obtained by such creditors constitutes a part of the assignment of the insolvent firm that it is obnoxious to the statute; but such is not this case. Nor does the case show any superior equities in the other creditors

whom, it is claimed, the receiver represents. In this case, as I have said, no fraud is shown; the indebtedness upon the mortgage was bona fide; the amount was originally the indebtedness of the partners for the fund which constituted his share of the stock upon which the business was conducted, and subsequently a part of it was for moneys actually used by the firm; and when the loan was made, it was with the assurance of Austrian, and which, he says, was consented to by Leopold, that the firm should secure it when Hart desired; and when the assumption of the debt actually occurred, which was several months before the mortgage was made, there is no pretense but that the firm was solvent; no creditor could, by trusting the firm for goods subsequently sold, acquire a superior equity to the individual who, under such circumstances, furnished the capital to one of the partners to carry on the business transactions of the firm. *Reeves v. Ayers* 38 Ill. 418.

There is nothing in the case raising any presumption of law that the conveyance to the defendant was invalid, but, on the contrary, the presumptions are in its favor. There is nothing to prohibit one creditor from obtaining security for his honest debt when the firm is solvent, no matter what may be the subsequent effect as to other creditors; nor is there anything in the statute applicable to this case forbidding his doing so.

The receiver is intrusted in this case with the execution of the assignment. The point is made by counsel that he has no legal right to maintain this action, because he cannot attack the validity of the mortgages. It is claimed, however, upon the other side, that the statute confers upon him the authority. Independently of the statute he could not do it: *Wakeman v. Barrows* 41 Mich. 363; *Millar v. Babcock* 25 Mich. 137; *Voorhies v. Frisbie* 25 Mich. 476; and I do not think it was the intention of the statute to confer such authority. How. Stat. § 8739. It is not claimed that there was any fraud in the assignment. Section 8744, therefore, does not apply.

The decree should be reversed with costs of both courts and the bill dismissed.